Good morning, your honors. My name is Kurt VanSkyver. May it please the court, I'm appearing this morning on behalf of Lori Deuschel, the petitioner and appellant in this matter. This morning, we're asking the court to reverse the decision of the District Court and the Social Security Administration, which had concluded that Ms. Deuschel was at fault in causing an overpayment of Social Security benefits. We're asking the court to reverse the lower court because the decision of the administration was not supported by substantial evidence in the record. Well, let me, sort of cutting to the chase here, and I mean, you know, I probably am going to have some tough questions for both of you on this because I, this case troubles me on some level. That, for example, if you look at the standard of review, and I think that there were, we've got some factual findings that she had some fault. And so I'm always concerned about when I'm not evaluating credibility, you know, as an appellate court, you don't just jump in there and do that. And so we've got some of that going on. But then I wonder if her some fault, what's the nexus to the overpayment in terms of it looks like you have a situation where someone actually didn't cash checks, return checks, and they're saying, yes, she didn't report something on time. And she says, seems to indicate that certain things weren't, but is there a nexus to the overpayment that occurs? Because ultimately after she returns some checks, then she gets a big check, and then they're saying, well, she should have known that. There seems to clearly be some bureaucratic incompetence here. So, and then I'm thinking from my, how much money are we talking about here at the bottom line now? A couple thousand bucks? Bottom line, Your Honor, we're talking about $13,800 and change. But she's repaid some of it, right? She has had recouped most of that. Most of that money was recouped in the early 2000s prior to the time that she was granted a recoupment hearing. But is she, but then is she wanting more than the $13,000 now that they've been incompetent? Is that, see, I mean, that's like, it doesn't seem to, you know, it's. Why don't you just clarify for us how much money is still in her pocket, so to speak? My understanding, Your Honor, is that there's still about $1,000 in her pocket. That was my understanding more briefly. So the rest of the money already went back to the Social Security people, correct? That is correct. And so what we're arguing over here is whether she has to give back the $1,000. Or is she trying to get. She wants the rest of it back. She wants the rest back, correct? That's correct, Your Honor. How much does she want back? What's at stake? What is she asking for? It's whatever $13,800 minus whatever hasn't been recouped, which I believe is about $1,000. So that's what she had sent back, the money she had, quote, sent back. Yes. And when we say sent back, she wasn't paid benefits for approximately a year. Right. Right. So I think the legal question is that there's no doubt she had some fault at the beginning in not reporting. And then the question is under the statute, is there some kind of break in the chain based on, one, what they told her, and then what the facts were kind of at the end of the game? Do you have – is there some authority we might look to for that? Yes, Your Honor. If you look at the regulation that's passed in this case by the administration, that's 20 CFR 404.507, the administration has fleshed out in that regulation what it means to be at fault within the language of the statute. And the regulation states that a person is at fault where the overpayment is caused by one of three possible actions, a failure to furnish information, the furnishing of incorrect information, or where the claimant knew or should have known that they were receiving an overpayment. So the language of the regulation indicates there should be a nexus between the fault of the claimant and the overpayment that occurred. So some fault factually that's been determined by the prior is that she didn't report her working immediately, correct? Yes. She went back to work in 1996. She did not report that immediately. And that appears to be the basis for the administration's decision as well as the district court's decision. So you're saying that that, in effect, she didn't report it, they then took care of it, so to speak, and that kind of like threw the line and we start over? We've got a number of sets of overpayments here. Now, it's our position that Ms. Duschel informed the administration prior to November 1997 that she had gone back to work at the Rockland Park Hotel. And please keep in mind that the overpayment began in April 1998. And that wasn't determined until after the overpayment had occurred. There's then a later series of overpayments beginning in June 1999 when our client went back to work at the Fowler Nursery job. And in June 1999, she sent a letter to the administration stating, I've gone back to work. Here's where I am. And they continued to send her checks, which she didn't cash at the time. Well, they have a theory that is sort of a link in the chain or that she started the process by failing to report. And then we have this bureaucratic machinery that is continuing to catch up. And she should have known that she wasn't entitled to these payments while she was working. The question, and I understand that argument as to the two periods, the first two periods of overpayment. But I'm not sure I understand that argument for the third period when she reports that the commission had told her that they would return the check. She returned checks to them and they said, we will return the checks to you if you're entitled to them for a second trial period. Is that undisputed that that statement was made to her at that time? Our client testified to it in front of the ALJ. And our reading of the ALJ's decision and the appeals council is that there wasn't an adverse credibility finding on behalf of either the ALJ or the appeals council. And there's no, nobody has come in to dispute the statement. There's no contrary evidence? I don't see any record evidence that the statement was not made. And I don't see any testimony. Well, but today at the hearing, was there someone said that's just absolutely not true? Or? No. Only Ms. Duschel testified at the hearing. That's my understanding of the record. And so. And the big check comes after that. The big check, well, I think. The bigger check, I guess. There was, she returned the checks in March 2000, and then the administration returned the checks to her after the statement had been made to her, that if it was returned, she'd been granted a second trial work period. So her view is that she got caught for not reporting the first time. She then began to report her work. And then based on that statement, she thought, in fact, they'd made a determination and they sent her the money. She didn't report a return to work right away in 96. Correct. She. But by March 2000, she had been, by then she had reported, correct? Correct. Multiple times. And they made adjustments for that. She had reported in, we believe, prior to November 97, a decision was made. She sent a letter in September 98 saying, we believe that you've been overpaid, we believe that your benefits have ended due to the substantial wages. She filed a reconsideration in October. And then in February of 99, they sent her another letter saying, you've been overpaid for these months, back in 98. When she went back to work in 99, she notified them immediately that she'd gone back to work. And then in March 2000, she notified them immediately when she had quit the job due to the stress and the problems associated with the job and her illness. Go ahead. So the opposing counsel is saying that during that second period in October 98, she had been informed that her disability was terminated, she filed for reconsideration, but she was continuing to collect disability payments and paycheck from her employment. Is that correct? In October 98, she was still at work at the Rockland Park Hotel. She collected benefits while she was receiving a salary. I'm sorry, a wage. So they say, well, a reasonable person would certainly know she wasn't entitled to collect disability payments and a paycheck, and so they argue that the Harrison case that you rely on would not be applicable. Right. With respect to that one month, October 99, what I'd like the panel to look at is the letter that she actually received respecting the overpayments. If you look at the September 98 letter that she received, it states that an overpayment will occur when there are substantial wages, and then it provides some suggestion of how they might determine when substantial wages occur, but it's not extremely specific. It says, well, look at your job skills, your duties, and your wages. And it does provide the suggestion that, well, if your wages are more than 500, we're likely to find an overpayment. But it doesn't specify one way or the other. And so when we're looking at whether or not a reasonable person would have believed that they were still entitled during that period, we submit the panel should look at whether a reasonable person in the place of the claimant, given her age, given her education, given her disabilities, would have understood that. And the measure that's been given to her at that point in the record is somewhat vague, and so we submit that a reasonable person in her shoes, looking at the wages just for October 98, would not have been able to understand whether or not she was being overpaid. Kagan. Well, I guess that – I guess from the standpoint that it's complicated by this right to trial period, too, isn't it? That, I mean, there is something – there is that existence of if they allow you a right to whatever the trial period is during – then they don't dock you during that period because they're seeing if you really can work. They don't penalize people that actually try to work. Correct. So she had had one trial period. What does the record show about that she's thinking she might be in a second trial period? Well, that's based on the conversation she had with the Social Security Administration employees. Well, and isn't there something else where she had conversations with people about they recalculated her benefits and found them to be more – they were from state and this, that, and the other. There was some – and she questioned them about that, and they said, oh, no, no, no, you're entitled to that. What's that? I believe there is some confusion as to when the trial – the initial trial period ended and when the overpayments began. And if you follow the chain of letters that the Administration sent out, I think it changes, depending on which letter you're looking at, what the trial period was and when it ended. Ultimately, in the 2000 decision that was handed down by the Administration, the 2000 decision says there the overpayments began in April of 98. Well, just so that I best understand your position, is your position even though she didn't immediately report that the overpayment was not a result of her failure to report, it was a result of the government's incompetence and at some point, if they couldn't get it right, how is she expected to have a higher standard of understanding on this? Yes, I'd say that is our position, Your Honor. And this isn't a case where she reported her work to the Administration in the month before the overpayments began. Our position, based on the record, is that she submitted an indication of her work prior to November 97, that the overpayments didn't begin until April 98, that there were many months in which the Administration could have looked into the matter, given her notice, and she could have taken action prior to the overpayments beginning. Also, how do we weave in, apparently she asked for a waiver then, and then they didn't process her waiver, and so then a court ordered them to process the waiver? Is that right? And what was the delay period there? That occurred later. She asked for a waiver of overpayment in 2000, when the Administration made its decision on the overpayments, with respect to which we're here today. And the Administration immediately began recouping it rather than processing the waiver. It's unclear to me when the waiver was processed by the Administration, but they recouped the wages beforehand, before giving her a hearing, before processing the waiver. The district court ordered them to provide a hearing. So it was only after the district court made that order in 2004, they processed the waiver, and then it went through the process of going before the ALJ and the Appeals Council. Let me just ask, if I look at the ALJ decision on page 30, that's where they say that the overpayment resulted from the failure to promptly notify the Social Security Administration of a return to work on multiple occasions. And then they list a little bit of the history that we've been talking about. It seems to me that's the ultimate conclusion, if we were to rule in your favor, that we would have to determine that that wasn't supported by substantial evidence. And so I guess I'm trying to understand if, is it almost like every time you go through this, it's a new ballgame, or is it one continuous thread? Because she definitely didn't, at the beginning, report. But then she did report. So I guess I'm asking whether the ultimate overpayment, which is in dispute here, did that arise because she hadn't reported accurately, or did it arise for another reason? From our perspective, Your Honor, it looks like it arose for another reason, because the reporting was done prior, many months prior to the overpayment beginning. And, you know, it's our position that if the court can't view the original fault as a type of original sin that then permeates throughout the process, allowing the Administration to say, okay, well, anyway. The fruit of the poisonous tree. The fruit of the poisonous tree. Well, basically, you're saying that there can be some liberation from your original sin. We do believe in liberation in this case, Your Honor. Would you like to reserve the remaining time and we'll talk with the Administration? I will, Your Honor. Thank you. I guess we'll ask you about your view on redemption. I don't know if I'm the best person to answer that. Good morning. My name is Shay Bond, and I represent the Commissioner of Social Security in this matter. And I know the Court has a lot of questions. I would just like to point out that I don't think there was ever a dispute between the parties that an overpayment actually existed or as to the dollar amount. The only issue, of course, is the entitlement to the waiver. I'd like to just address quickly the question about when the request for the waiver occurred. What happened was that the claimant had said when she came into court the first time and to district court and said, I had requested waiver, the agency didn't have a record of her having actually requested the reconsideration and the personal conference. So that was that dispute with that initial district court action. But the Court decided to send it back on the sentence six remand to actually continue with the administrative proceedings, which is what the agency did. So we accepted her request for waiver, even though we didn't have a record of having originally received it. So that's what caused that delay. Could you focus on this third period of overpayment after the point where she had collected the checks, returned the checks to the agency, and then she reported that they said, if we determined you're entitled to them, we will send you the money back. And then they did send her a check back. My question there is, even if we took your argument that her failure to report initially started this chain reaction, I don't understand how we could say that with respect to this third period where she was relying on what the agency told her and the return of the checks. Tell me how her initial fault, her original sin, as we said, made that to be with fault. Well, I think with the original non-reporting, that kind of started the chain of events here. And as we were arguing in our brief, the agency was always trying to play catch-up to figure out, you know, what she was earning from who, what not. Well, but you guys are the experts. And then it's like you're holding her to a higher standard than you can even achieve. I mean, you expect her to, you know, you're the experts, and when you do have the information, it goes on and on, and then you send her more. And she actually, it's pretty unheard of that people actually don't cash checks, and they send them back unopened. And so then somehow we still want to blame her from in the beginning that she didn't report immediately when you finally do have all the information. Well, I would disagree that we necessarily had all the information. We have the claimant that, if we're jumping to that third period, we have the claimant saying that she was told this information by the agency, but there's no proof of that. She testified that's the case. Well, I agree with the defense that those conversations. Check. I mean, that's what's so odd. Oh, no, no. I agree. But I think what the district court was saying is that, you know, she did say she sent back the checks. They were unopened. I think she said she sent it back to just a group of them, like six or seven checks. But there's no indication that when she returned them that there was any explanation as to why she was returning them. So why did she do it? But if she was an overpayment, you know, that's in your ballpark. She doesn't, she returned them because she thought the government would go into sequestration and that she was donating to this terrible situation. Well, I don't think she needs to make an explanation when the Social Security Administration is the determiner, so to speak. But I think with this claimant, she's on notice that this process is going on, that, you know, her work activity is being looked at to see if she still qualifies for benefits. I think she has exhibited sort of a sophistication about this. You know, when you read her letters to the agency, I think they're very well articulated. She had held jobs. And if we're going to the third period of disability, it was with the nursery. She was actually doing payroll. She learned Spanish for the job. Specifically, how did her initial non-reporting cause the agency to misinform her that she was qualified for the second trial period and for payments and to send her back the money that she had returned to them? But what – I guess what I'm saying is that it's – there's no documentation that the agency actually told her, oh, return these checks, and then we will return them to you if – But don't we have to think that – But then you did. Don't you – when you cut a check, you have to justify it. She didn't ask you for any money. She returned money to you. And now you want to blame her for the overpayment. But it would be the agency's reasonable interpretation to say these uncashed checks came back to us. We don't know why. We're going to reissue the check to the claimant so she can have her – But aren't they supposed to have the master ledger in the sky that figures out how much they owe her? I mean, that's what they do at the Social Security Administration, figure out how much they owe. And so it seems odd. You could have put on some testimony to that effect, but all we have is the record in front of us. So – Correct. But, I mean, at the hearing, I know you'd ask if there was any testimony put on it. It's a non-adversarial process. It's – you know, we don't have agency personnel come in and testify. Her testimony as true? I'm sorry. Could you repeat that? Do we need to take her testimony as true because the court did not make an adverse credibility determination? Well, I would also point out that there was no challenge to credibility until we had the supplemental briefing. There was no challenge to credibility in the district court. It was not addressed. But I think with the ALJ's findings and then when the appeals counsel adopted those findings, I think there's this understanding that they did not – the agency did not take what she said to be as true. They did not find that – her statements credible. So as you stand here today, did the government do everything right? You know, there might have been some sort of bureaucratic lapse, but that in and of itself does not take this out of the question of whether the claimant was also – also had fault in causing this overpayment. There can be some fault on the – You know, I guess from the standpoint that it concerns me that you still would take the position that the government handled this perfectly when – and I'm looking here and we have pro bono counsel. I know you get paid. I know we get paid. And every dispute is really important to us. And I understand the legal significance of we don't want the government – just that – just because there's like some little technicality that then people can keep money if the government makes – but, you know, it has to cross your mind. I mean, if this were a business, we would – and you're the trustee of all our money that if this were a business, they would never get away with this. Your Honor, the Social Security Administration processes millions of claims per year. We handle, you know, billions of dollars' worth of benefits. There will be – But does that allow you to strive for less than a high state – I mean, you're still saying they did – they did a fine job. I'm not saying that we – that every aspect of this case was handled perfectly. I don't want to – if that's what I was communicating, I don't want to have that as what I was trying to say. But any kind of bureaucratic lapse that occurred here I'd say does not overcome the evidence that the claimant here was at fault. So what's your best argument that her failure to – her sin – what's your best argument that that becomes the nexus way down the line of issuing that overpayment check? To follow up on that question, I'm very interested as well. I'd like to know step by step, because we don't really understand what's happening in the bowels of the agency. Step by step, how her initial failure to report led to this return of the checks in – I guess it was in 2000, February 2000. Well, I don't know if there necessarily has to be the nexus between the original sentence we're calling it, because that was the failure to report the activity in 96-97. And that kind of started the agency having to do the calculations that it needs to do when it looks at that trial work period, when you determine the nine months of work activity that counts towards the completion of the trial work period. Figured out in September 98 that she wasn't entitled to disability and they terminated it. Right. But you have to say that her failure to report way back then still led to this overpayment in June 1999 to February 2000. I want to understand how. Well, I think when we get into the – that later period, it's the – that aspect of the – determining the at fault is that she accepts payments that she should have known or did know or should have known that she wasn't entitled. So that's another aspect of the – But when you go to the – what the ALJ said, they said it was because of her failure to promptly notify. They said the overpayment results from the failure to promptly notify on multiple occasions. So – Well, I think that's – We're kind of stuck with what the ALJ said. So going back to I think what is the fundamental question is, which failure to notify resulted in the overpayment that's in dispute here? Well, there was the initial failure to notify in 1996-97. But then they did terminate. And that – isn't there at some point kind of the end of the road for each of these payments? I think, again, because the confusion arises when you get into that second after the trial work period and you get into the extended period of eligibility, again, there's other calculations going on. And you can be, you know, ceased from benefits if you continue to work at income levels that exceed what we say you can work. Well, maybe to be more precise, the first failure to notify is one that you've identified. What other failures to notify would you point to that resulted in the overpayment at issue? Well, again, I would just say it's that first one that started the ball rolling. She did report that she was starting to work for the nursery, and that was in the 99, sometime in 1999. Was that timely? I guess that would be timely, that she was reporting that she was going to start to work. I'm not sure if she then continued to tell us, like, how long that period ran, because I know she worked there, I think it was for over a year. So so far we still have the original. We don't have any additional. Right. But then we get into the other aspect of when you're talking about the fault, it's the accepting of the payment of monies that you should know that you're not entitled. That's not what the ALJ said. He said that the failure to notify is the reason all this happened. And we've got to take them at face value. So other than the – is it fair to say, then, based on your – I'm trying to understand your answer, and I don't want to misstate it, but it's fair to say that you're saying there's not a specific failure to notify that occurred after the initial one, and that's the one we ought to look at. You mean, you're talking about the later? Correct. The later. Again, I would just – there's the – the initial failure started the ball rolling here. And then, you know, she did report that she was going to start working at the nursery job in 99. But when she received those checks, she should have known, particularly given the nature of the work that she was doing. But she gave a cash – so the real answer would be there may have been an initial failure to report. But you're saying that the later overpayment, it wasn't really caused by failure to report. It was caused by a mistake by the Social Security Administration that she didn't divine accurately. Well, it's – So she returned – there was a failure to notify. She returned them, and then they gave them back to her. And the reason they gave them back didn't have to do with her failure to report. It was – well, that's the problem, is that she is – she has said that the agency had told her to return these checks because, you know, if you don't feel you're entitled to them, and then we'll make this determination. But there's no evidentiary support for that. And it's amazing in that the claimant has a very detailed account of these letters that she sent the agency kind of along the way. Her explanation about the return of the checks is after the fact. There's nothing – there's no letter that she submitted that I would think someone who keeps very detailed records like this would have sent to the agency with the checks. But we have to figure out what's her – maybe to make it more precise and simpler, the fault that we're looking at is under the regulation. And the only fault you've identified so far is her initial failure to report. Is there any other fault that we should be evaluating? It's the keeping of the checks that she should have known for monies that she should have known she shouldn't have been entitled to for that last period. The ones she didn't cash, keeping those checks? Well, she – I mean, what's the – what benefit are you getting from checks that you don't cash? Well, that shows in her mindset that she knew that it was the monies that she shouldn't have been entitled to. But then she also returned them. But there's no evidence showing that when she returned them that she explained why she was returning unopened checks to the agency. And, again – So her fault – her fault was not telling you the basis for your mistake. I'm just trying to understand. But, again, you know, the agency, again, is trying to process information. I'm totally sympathetic to the whole volume that you have to deal with. I know, but the question is, is she also at fault here? If you're saying that the agency contributed some fault, the question is, is she also at fault? Okay. And the answer would be yes in this instance. It is for failure to be more clear as to why she wasn't entitled to these uncashed checks. Is that her fault? Correct. Correct. And, I mean, I think that's what the district court was focusing on, is that, you know, you're returning these checks. They're unopened. There's no explanation as to why the agency is getting a batch of checks. The – it wouldn't be unreasonable for the agency then to turn around and say, we're issuing you a lump sum so that you can have your money to cash. Maybe they think that she didn't get the checks or that it was sent to the wrong address. And we just don't have that information. And then it's only after the fact when the overpayment is being assessed. Are you listening to yourself? That in terms of that you're saying that maybe when people return checks to the government, that the government then assumes that they are now a – that they consolidate all of them and issue one check because maybe someone doesn't have a That's a reasonable interpretation to say that because we don't know why she returned the checks. That would be – it would be reasonable for the agency to reissue the checks as one lump sum. All right. Thank you. Thank you. Your Honors, in the nine seconds I have here, I'd like to speak to the return of the checks. Page 107 in the records is the March 2000 letter that our client sent to the Social Security Administration, the first paragraph of which says, I went back to work in 1999. I notified you. Since then I've received checks from the Administration. Here are the checks unopened. So I believe that provides evidence that shows that our client did provide some explanation to the Administration of why she was returning the checks. All right. Thank you. The case just argued, Duchelle v. Estruz, submitted. I do want to thank you, Mr. VanScriver, for participating in the court's pro bono project. I also appreciate the argument from Ms. Bond. I know that the details of these are always difficult and that you're here as a special assistant United States attorney appearing for the Social Security Administration, so we appreciate your argument and participation as well. The case is submitted.
judges: McKeown, Callahan, Ikuta